11-2635 (L)
In Re Quigley Company, Inc.

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE SECOND CIRCUIT

August Term 2011

Argued: September 27, 2011                    Decided: April 10, 2012

Nos. 11-2635, 11-2767

———————————————————

IN RE QUIGLEY COMPANY, INC.

PFIZER INC.,
*Appellant,*

QUIGLEY COMPANY, INC.,
*Debtor-Appellant,*

-v-

LAW OFFICES OF PETER G. ANGELOS,
*Appellee.*

———————————————————

Before: WALKER, STRAUB, and LIVINGSTON, *Circuit Judges.*

1

1    Appellant Pfizer Inc. and Debtor-Appellant Quigley Co., Inc. appeal from a May

2 23, 2011 judgment of the United States District Court for the Southern District of New

3 York (Holwell, *J.*), reversing an order of the United States Bankruptcy Court for the

4 Southern District of New York (Bernstein, *C.J.*).  The bankruptcy court held that an

5 injunction issued in the bankruptcy proceedings of Quigley Co., Inc. applied to stay

6 certain suits against Pfizer Inc., Quigley's parent company.  The district court

7 reversed, holding that the injunction did not bar the suits from proceeding.  The Court

8 of Appeals, Livingston, Circuit Judge, held that: (1) court of appeals had jurisdiction

9 to hear the appeal; (2) bankruptcy court had jurisdiction to issue injunction; and (3)

10 injunction does not bar suits in question against Pfizer Inc.

<br>

11           SHEILA L. BIRNBAUM, SKADDEN, ARPS, SLATE,
12           MEAGHER & FLOM LLP, New York, New York (Jay M.
13           Goffman, George A. Zimmerman, Bert L. Wolff, *on*
14           *the brief*) for *Appellant.*

15           MICHAEL L. COOK, SCHULTE ROTH & ZABEL LLP, New
16           York, New York (Lawrence V. Gelber, *on the brief*) for
17           *Debtor-Appellant.*

18           JEFFREY L. JONAS, BROWN RUDNICK LLP, Boston,
19           Massachusetts (Edward S. Weisfelner, Brown
20           Rudnick LLP, New York, New York; James W. Stoll,
21           Thomas H. Montgomery, Brown Rudnick LLP,
22           Boston, Massachusetts, *on the brief*) for *Appellee.*

23           THOMAS A PITTA, LOWENSTEIN SANDLER PC,
24           Roseland, New Jersey (Jeffrey Prol, Adrienne L.
25           Isacoff, Michael T.G. Long, *on the brief*) for *amici*
26           *curiae* Hissey Kientz L.L.P. and Hissey, Kientz &
27           Herron P.L.L.C.

1  LIVINGSTON, CIRCUIT JUDGE:

3  This case requires us to address the scope of federal bankruptcy jurisdiction over

4  suits against non-debtor third parties, as well as the scope of a stay issued pursuant

5  to 11 U.S.C. § 524(g)(4).  In reaching these questions, we are also called upon to clarify

6  our own jurisdiction to hear appeals from decisions of district courts reviewing

7  bankruptcy court orders.

8  Appellant Pfizer Inc. ("Pfizer") and Debtor-Appellant Quigley Co., Inc.

9  ("Quigley") (collectively "Appellants") appeal from a judgment entered May 23, 2011

10  in the United States District Court for the Southern District of New York (Holwell, *J.*)

11  reversing the Clarifying Order of the bankruptcy court (Bernstein, *C.J.*) and holding

12  that Appellee Law Offices of Peter G. Angelos ("Angelos") may bring suit against Pfizer

13  for claims based on "apparent manufacturer" liability under Pennsylvania law.  We

14  determine that we have jurisdiction to hear the appeal; that the bankruptcy court had

15  jurisdiction to issue the Clarifying Order; and that the Clarifying Order does not bar

16  Angelos from bringing the suits in question against Pfizer.  Accordingly, we affirm the

17  district court.

18  **BACKGROUND**

19  Quigley was involved in the manufacture of "refractories," which are "materials

20  that retain their strength at high temperatures."  *In re Quigley Co., Inc.*, 449 B.R. 196,

21  198 (S.D.N.Y. 2011) ("District Court Opinion").  In the decades from the 1930's through

22  the 1970's, some Quigley products, including a product known as "Insulag," which was

23  primarily used as an insulator in high heat environments, contained asbestos.  *Id.*

3

1    Pfizer acquired Quigley in 1968, the latter becoming Pfizer's wholly-owned subsidiary.

2    *Id.* Post-acquisition, various marketing materials for Quigley products, including

3    Insulag, "began to include the Pfizer name, logo, and trademark." *Id.* After the

4    hazardous effects of asbestos became widely known, more than 160,000 plaintiffs filed

5    asbestos-related suits against Quigley. *Id.* at 199. Many of these suits also named

6    Pfizer as a defendant. *Id.* Quigley filed for Chapter 11 bankruptcy in 2004. *Id.*

7        Important to the instant litigation are a number of insurance policies that

8    Quigley and Pfizer share ("Insurance Policies") as well as "the funds contained in a

9    certain insurance trust under which Quigley and Pfizer are joint beneficiaries"

10    ("Insurance Trust"). Original Preliminary Injunction ("OPI") at 3. As found by the

11    bankruptcy court, Pfizer and Quigley have used and may continue to use the policies

12    and the trust "to satisfy settlements, judgments and defense costs related to . . .

13    Asbestos Related Claims." *Id.* The Insurance Policies and Insurance Trust cover

14    claims against Pfizer or Quigley "on a first billed, first paid basis, irrespective of

15    amounts previously billed by or paid to Pfizer or Quigley." *Id.* Quigley contemplates

16    that "the remaining limits under the Shared Insurance Policies and the amounts

17    contained in the Insurance Trust . . . will be used to fund [its] pre-negotiated plan of

18    reorganization." *Id.*

19        In 2004, the bankruptcy court granted Quigley's motion for a preliminary

20    injunction (the OPI), pursuant to 11 U.S.C. §§ 105(a) and 362(a), enjoining "all parties

21    . . . from taking any action in any and all pending or future Asbestos Related Claims

22    against Pfizer during the pendency of Quigley's chapter 11 case." *Id.* at 5-6. The goal

of the OPI was to prevent "depletion of the Shared Insurance Policies and the Insurance Trust assets," which would "cause immediate and irreparable injury to Quigley's estate and impair Quigley's ability to implement its pre-negotiated chapter 11 plan and successfully reorganize under chapter 11." *Id.* at 4. The OPI allowed a party asserting that "it holds an Asbestos Related Claim solely against Pfizer based on a product having no relation to Quigley" to obtain relief from the injunction by demonstrating to the bankruptcy court's satisfaction that such claim truly arose from a product having no relation to Quigley and also that the Insurance Policies and Insurance Trust "could not be utilized to satisfy any portion of the defense costs, settlements or judgments" related to the claim and would not be "diminished or impaired by [its] prosecution." *Id.* at 6.

In 2007, the bankruptcy court modified the preliminary injunction "to parallel the more limited . . . injunction" contemplated by Quigley's proposed reorganization plan. *In re Quigley Co., Inc.*, Bankruptcy No. 04-15739 (SMB), 2008 WL 2097016, at *2 (Bankr. S.D.N.Y. May 15, 2008) ("Clarifying Order" or "CO"). As set out in the bankruptcy court's order, the Amended Preliminary Injunction ("API") tracked the language of § 524(g)(4)(A)(ii) of the Bankruptcy Code. Section 524(g) authorizes bankruptcy courts in asbestos-related bankruptcies to enter, in connection with confirmation of a reorganization plan, an injunction channeling certain classes of claims to a trust set up in accordance with the plan. The trust makes payments to both present and future claimants, thereby helping to ensure that legitimate claimants against the bankruptcy estate who develop symptoms of asbestos-related disease years

after the estate's assets would otherwise have been depleted are able to recover.  The

API here, employing § 524(g)(4)(A)(ii)'s language, provided as follows:

> [P]ursuant to sections 105(a) and 362(a) of the Bankruptcy Code, during
> the pendency of Quigley's chapter 11 case, all parties . . . are hereby
> stayed, restrained and enjoined from commencing or continuing any legal
> action against Pfizer alleging that Pfizer is directly or indirectly liable for
> the conduct of, claims against, or demands on Quigley to the extent such
> alleged liability of Pfizer arises by reason of–
>
> > (I) Pfizer's ownership of a financial interest in Quigley, a past or
> > present affiliate of  Quigley, or a predecessor in interest of
> > Quigley;
> >
> > (II) Pfizer's involvement in the management of Quigley or a
> > predecessor in interest of Quigley; or service as an officer, director
> > or employee of Quigley or a related party;
> >
> > (III) Pfizer's provision of insurance to Quigley or a related party;
> >
> > (IV) Pfizer's involvement in a transaction changing the corporate
> > structure, or in a loan or other financial transaction affecting the
> > financial condition, of Quigley or a related party, including but not
> > limited to–
> >
> > > (aa) involvement in providing financing (debt or equity), or
> > > advice to an entity involved in such a transaction; or
> > >
> > > (bb) acquiring or selling a financial interest in an entity as
> > > part of such a transaction.

API at 2-3.  The order further provided that "nothing contained in this order shall

prohibit any party in interest from seeking relief from the automatic stay of section

362(a) of the Bankruptcy Code or the terms of this order by filing an appropriate

motion with the Court."  *Id.* at 6.

Beginning in 1999, Angelos brought multiple suits (the "Angelos suits") in

Pennsylvania against Pfizer on behalf of plaintiffs alleging they were injured by

exposure to asbestos.  CO at *2.  At least some of these suits sought to hold Pfizer liable in connection with products containing asbestos and manufactured by Quigley under an "apparent manufacturer" theory of liability as set out in Restatement (Second) of Torts § 400.  *Id.*  The Angelos suits alleged that Pfizer's logo appeared on Quigley's advertising and the packages of Quigley's asbestos-containing products.  *Id.* at *5.  Under § 400, "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." *Forry v. Gulf Oil Corp.,* 237 A.2d 593, 599 (Pa. 1968) (quoting Restatement (Second) of Torts § 400 (1965)) (internal quotation marks omitted).  Angelos moved for partial summary judgment against Pfizer on the issue of liability in many of these suits, and in response Pfizer moved in the bankruptcy court to enforce the API against Angelos.  CO at *2-3. Angelos argued that the liability it sought to impose on Pfizer was based on Pfizer's own conduct in permitting its label to be affixed to Quigley products containing asbestos and to Quigley advertising, and therefore its suits were not barred by the API. *Id.* at *3.

In its Clarifying Order, the bankruptcy court began by noting that all the actions upon which Pfizer's liability is predicated in the Angelos suits were actually undertaken by Quigley, and that consequently the relevant inquiry for determining whether the API enjoins continuance of these suits is whether "Pfizer's liability 'arises by reason of' its ownership or management of Quigley," as the API, mirroring § 524(g)(4)(A)(ii), provides.  *Id.* at *5.  It then observed that the phrase "arises by reason of" is ambiguous.  On the one hand, the liability Angelos seeks to impose on

1    Pfizer "arises by reason of the use of its name and logo by Quigley," not its ownership

2    or management of Quigley. *Id.* (internal quotation marks omitted). On the other hand,

3    "[b]ut for Pfizer's ownership and/or management of Quigley, its name and logo would

4    never have been used" on Quigley products. *Id.*

5        The bankruptcy court concluded that the API does cover § 400 liability.  It

6    reasoned that the API plainly enjoins claims premised on successor and alter ego

7    liability, and that both of these types of liability will often involve conduct by the third-

8    party defendant that is more wrongful than "[t]he use of the Pfizer name and logo."

9    *Id.* at *6.  The bankruptcy court also noted the similarity between *respondeat superior*

10   liability and liability imposed under § 400, since it concluded that both forms of

11   liability are considered "derivative" under Pennsylvania law.  *Id.*  Suits alleging

12   *respondeat superior* liability are clearly covered by the API so, the bankruptcy court

13   reasoned, § 400 suits should be as well.  *Id.*[1]  The bankruptcy court determined that

14   the API reaches the Angelos suits, and therefore it directed Angelos and the plaintiffs

15   in these suits to cease prosecution of them.  *Id.* at *8.

16       Angelos appealed the CO to the United States District Court for the Southern

17   District of New York.  The district court did not quarrel with the bankruptcy court's

18   determination that the conduct for which Angelos seeks to impose liability on Pfizer

---

[1]Additionally, the bankruptcy court discussed our then-recent decision in *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) (hereinafter "*Manville III*," to adhere to the numbering scheme employed by previous decisions discussing the long *Manville* line of cases), *rev'd sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S. Ct. 2195 (2009), which it read to require that, to be enjoined under 11 U.S.C. § 524(g), a claim against a third party must be derivative.  CO at *7.

8

1    was Quigley's.  District Court Opinion at 203-04.  However, the district court disagreed

2    with the bankruptcy court that the fact that Quigley would not have marked its

3    products with Pfizer's name and logo but for Pfizer's ownership of Quigley leads to the

4    conclusion that the API covers the Angelos suits.  Instead, the district court viewed the

5    relevant inquiry as whether the liability Angelos seeks to impose on Pfizer arises, *as

6    a legal matter*, from its ownership of Quigley.  *Id.* at 204-05.  The district court found

7    support for this position in our decision in *Manville III*, which it read as requiring, in

8    cases interpreting the scope of an 11 U.S.C. § 524(g) injunction, "a legal analysis . . .

9    under state law to determine whether [a defendant] had 'an independent legal duty in

10    dealing with the plaintiffs, notwithstanding the factual background in which [that]

11    duty arose.'"  *Id.* at 205 (quoting *Manville III*, 517 F.3d at 63).  The district court

12    explained that § 400 imposes an independent duty on those putting themselves out as

13    the apparent manufacturer of a product made by another not to hold themselves out

14    as sponsors of defective products.  *See id.* at 207.  Because Angelos "seeks to bring

15    separate direct actions against Pfizer . . . because Pfizer breached an independent legal

16    duty not to employ its name and logo in the marketing of a defective product," the

17    Angelos suits, in the district court's view, fell outside the scope of the API.  *Id.*

18    Accordingly, the district court reversed the bankruptcy court, permitting the Angelos

19    suits to go forward in Pennsylvania state courts.  *Id.* at 209.

20

21

22

1    The district court entered judgment for Angelos on May 23, 2011. Quigley

2    moved for reconsideration, and the district court denied the motion.[2] This appeal

3    followed.

## DISCUSSION

5    *This Court's Jurisdiction*

6    The parties do not dispute our jurisdiction to hear this appeal. Nevertheless,

7    "[w]e have an independent obligation to consider the presence or absence of subject

8    matter jurisdiction *sua sponte.*" *Coll. Standard Magazine v. Student Ass'n of State*

9    *Univ. of N.Y. at Albany*, 610 F.3d 33, 35 (2d Cir. 2010) (per curiam) (internal quotation

10   marks omitted). We have made clear in the past that 28 U.S.C. § 158(d) "is the

11   exclusive source of court of appeals jurisdiction over orders of district courts reviewing

12   bankruptcy court rulings." *In re Lomas Fin. Corp.*, 932 F.2d 147, 150 (2d Cir. 1991).

13   Section 158(d)(1) provides that "[t]he courts of appeals shall have jurisdiction of

14   appeals from all final decisions, judgments, orders, and decrees" of United States

15   district courts and bankruptcy appellate panels reviewing decisions of bankruptcy

---

[2]After entry of final judgment but before the decision on the motion to reconsider, Hissey Kientz L.L.P. and Hissey, Kientz & Herron P.L.L.C. (collectively "Hissey") gave notice of their intention to intervene, and moved to intervene on June 24, the same day the district court issued its decision denying Quigley's motion to reconsider. The district court granted the motion to intervene on June 27. On appeal, Appellants challenge the district court's grant of the motion to intervene, arguing that Hissey does not have standing. Because Hissey conceded at oral argument that its purposes in seeking to intervene would be vindicated if we were to treat it as an *amicus curiae*, we do so, and do not reach the standing question. The Clerk of Court is directed to amend the caption accordingly.

courts.  *See* 28 U.S.C. § 158(a)-(b), (d).[3]  But a district court's order can be final for purposes of appealability only if the order of the bankruptcy court below was also final.  *See In re Fugazy Express, Inc.*, 982 F.2d 769, 775 (2d Cir. 1992) ("The district court's own decision of an appeal from the bankruptcy court is not a final decision for purposes of appeal to the court of appeals unless the order of the bankruptcy court was final.").  Therefore, we may exercise jurisdiction over this appeal only if the order of the bankruptcy court was final.

"The standards for determining finality in bankruptcy differ from those applicable to ordinary civil litigation."  *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1283 (2d Cir. 1990).  This difference is due to the "fact that a bankruptcy proceeding is umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant and that often involve decisions that will be unreviewable if appellate jurisdiction exists only at the conclusion of the bankruptcy proceeding."  *Id.*  Accordingly, we regard as final "orders that finally dispose of discrete disputes within the larger case."  *Id.* (emphasis omitted) (internal quotation marks omitted).  Bankruptcy court orders lifting an automatic stay are final for purposes of appealability.  *See, e.g.*, *In re Chateaugay Corp.*, 880 F.2d 1509, 1511 (2d Cir. 1989).  So are orders denying relief from an automatic stay, *see, e.g.*, *In re Pegasus Agency, Inc.*, 101 F.3d 882, 885 (2d Cir. 1996), so long as the bankruptcy court has not indicated

---

[3]Section 158(d) also provides for jurisdiction for courts of appeals to hear appeals on the basis of certification.  *See* U.S.C. § 158(d)(2).  Because the instant appeal has not been certified, this provision is not relevant here.

1   that it contemplates further proceedings on the question of relief from the stay, *see*

2   *Lomas*, 932 F.2d at 151; *In re Enron Corp.*, 316 B.R. 767, 770 (S.D.N.Y. 2004).

3          Here, the Clarifying Order that is the subject of this appeal did not grant or

4   deny relief from a stay; rather, it clarified that a stay applied to a particular party.  But

5   in *Lomas*, we stated that whether a bankruptcy court order "involve[s] an appeal from

6   a denial of a motion to lift the automatic stay . . . [or] involves an appeal from an order

7   holding . . . that the automatic stay applies to the action" is not "a distinction of

8   consequence to the finality issue."  *Lomas*, 932 F.2d at 151 n.2.  Furthermore, we have

9   no reason to believe that the bankruptcy court contemplates additional proceedings as

10  to the applicability of the stay to the Angelos suits.  The bankruptcy court's resolution

11  of the dispute between Angelos and the Appellants as to whether the stay applies to

12  the Angelos suits is the equivalent of a decision from that court on a motion seeking

13  relief from a stay.  Accordingly, we agree with the district court's well-reasoned

14  conclusion that the bankruptcy court's CO was final, *see In re Quigley*, No. M-47 (RJH),

15  2010 WL 356653 (S.D.N.Y. Jan. 27, 2010), and we thus have jurisdiction to hear this

16  appeal.

17  *The Bankruptcy Court's Jurisdiction to Issue the Clarifying Order*

18         While the parties do not dispute our jurisdiction to hear this appeal, they do

19  dispute the bankruptcy court's jurisdiction to enjoin the Angelos suits from going

20  forward.  *Amicus* Hissey suggests that the Supreme Court's recent opinion in *Stern v.*

21  *Marshall*, 131 S. Ct. 2594 (2011), supports the view that the bankruptcy court's

22  exercise of jurisdiction contravened Article III of the Constitution.  Angelos argues that

23  jurisdiction is lacking under the Bankruptcy Code.  We disagree with both positions.

1    a. <u>Article III and the Bankruptcy Court's Jurisdiction</u>

2    *Stern* involved a dispute between the estates of Vickie Lynn Marshall (popularly

3    known as Anna Nicole Smith and herein referred to as "Vickie"), the wife of the late J.

4    Howard Marshall, and Pierce Marshall ("Pierce"), J. Howard Marshall's son.  *Id.* at

5    2601.  After the death of her husband, Vickie filed for bankruptcy in federal court.

6    Pierce filed a proof of claim in that proceeding, charging that Vickie had defamed him

7    in connection with a suit she had previously filed alleging that her husband intended

8    to provide for her through a trust, and that Pierce had tortiously interfered with that

9    gift.  Upon Pierce's filing of a proof of claim in the bankruptcy proceeding, Vickie

10    responded with a counterclaim for the alleged tortious interference.  The bankruptcy

11    court issued a final judgment in favor of Vickie on her counterclaim, *see id.* at 2601,

12    and Pierce then challenged the bankruptcy court's jurisdiction to do so.

13    The Supreme Court held that the bankruptcy court's entry of final judgment on

14    Vickie's counterclaim violated Article III of the Constitution.[4]  *Id.* at 2608.  "Article III,"

15    the Court reasoned, "could neither serve its purpose in the system of checks and

16    balances nor preserve the integrity of judicial decisionmaking if the other branches of

17    the Federal Government could confer the Government's 'judicial Power' on entities

18    outside Article III."  *Id.* at 2609.  The Court concluded that the entry of final judgment

---

[4]Article III commands that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  Art. III, § 1.  The Article further provides for the judges of these courts to hold their offices during good behavior, without diminution of salary.  *Id.*

on Vickie's counterclaim "involve[d] the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action, when the action neither derive[d] from nor depend[ed] upon any agency regulatory regime." *Id*. at 2615 (emphasis omitted). Accordingly, the counterclaim had to be decided by an Article III court.

Whatever *Stern*'s precise contours (a matter we need not reach) we conclude that *Stern* has no application to the present case. The Supreme Court in *Stern* indicated that its holding was a narrow one. *See id*. at 2620 ("We conclude today that Congress, in one isolated respect, exceeded [Article III's] limitation in the Bankruptcy Act of 1984."); *see also In re Salander O'Reilly Galleries*, 453 B.R. 106, 115 (Bankr. S.D.N.Y. 2011) ("*Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case."). Its facts, moreover, are far removed from the instant situation. The CO and the API at issue here concern the stay of litigation during the pendency of Quigley's bankruptcy, rather than the entry of final judgment on a common law claim. Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts. *See generally, e.g.*, *In re Prudence Bonds Corp.*, 122 F.2d 258 (2d Cir. 1941) (discussing stays of litigation imposed by a bankruptcy court). Accordingly, the bankruptcy court was well within constitutional bounds when it exercised jurisdiction to enjoin the Angelos suits.

14

1        b. <u>Statutory Jurisdiction</u>

2        Statutory jurisdiction is a separate matter.  28 U.S.C. § 1334 provides for

3    original jurisdiction in the district courts for "all cases under title 11" and "all civil

4    proceedings arising under title 11, or arising in or related to cases under title 11."  28

5    U.S.C. § 157(a), in turn, provides that district courts may refer all cases or proceedings

6    over which they have jurisdiction under 28 U.S.C. § 1334(a) or (b) to the bankruptcy

7    courts.  The parties do not dispute that, if the district court had bankruptcy jurisdiction

8    because the Angelos suits "aris[e] under title 11, or aris[e] in or [are] related to" the

9    Quigley bankruptcy, the bankruptcy court's exercise of jurisdiction was proper.[5]

10       Bankruptcy jurisdiction is appropriate over "third-party non-debtor claims that

11   directly affect the *res* of the bankruptcy estate."  *Manville III*, 517 F.3d at 66; *see also*

12   *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for

13   determining whether litigation has a significant connection with a pending bankruptcy

14   [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any

---

[5]In the OPI, the bankruptcy court found that the proceeding before it was a "core proceeding" within the terms of 28 U.S.C. § 157(b)(2), thus enabling it to issue orders rather than merely to make proposed findings of fact and conclusions of law, *see* 28 U.S.C. § 157(b)(1), (c)(1).  Angelos does not question this conclusion before us, or even cite 28 U.S.C. § 157 in its brief, and has thereby waived any objection to the bankruptcy court's determination.  *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").  Although Hissey's brief alludes to 28 U.S.C. § 157, "an issue raised only by an *amicus curiae* is normally not considered on appeal"; we see no reason to depart from this general rule here.  *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 436 n.5 (2d Cir. 2002).

1 conceivable effect on the bankrupt estate." (internal quotation marks omitted)).[6]  The

2 application of this test to the claims at issue would at first glance appear

3 straightforward.  The Insurance Policies and Insurance Trust are the joint property of

4 Pfizer and Quigley's estate.  *See In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir.

5 2010) (per curiam) ("*Manville IV*") ("[T]he insurance policies that Travelers issued to

6 Manville are the estate's most valuable asset."); *MacArthur Co. v. Johns-Manville*

7 *Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (agreeing with the "[n]umerous courts [that] have

8 determined that a debtor's insurance policies are property of the estate").  If the

9 Angelos suits succeed – or even if they merely require Pfizer to incur defense costs in

10 litigating against them – the record is uncontradicted that Pfizer may submit a claim

11 to be paid out of insurance that is this joint property.  Therefore, these suits could

12 directly affect Quigley's bankruptcy estate, and bankruptcy jurisdiction under 28

13 U.S.C. § 1334 is appropriate.  *See Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639

14 F.3d 572, 579 (2d Cir. 2011) ("If [the plaintiffs are] successful in their claims against

15 [the defendant], the funds they recover will benefit the . . . bankruptcy estates.  It is

16 not difficult to conclude that the 'conceivable effect' test is satisfied." (citation omitted)).

17     Angelos objects that the impact of the Angelos suits on Quigley's bankruptcy

18 estate is too attenuated to confer bankruptcy jurisdiction.  We disagree.  The

---

[6]We have also expressed the test for bankruptcy jurisdiction as an inquiry whether the third-party action has "a significant connection" with the bankruptcy case in question.  *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983) (Friendly, J.) (internal quotation marks omitted).  Any possible difference between these two standards is immaterial for our purposes, as the exercise of bankruptcy jurisdiction was proper if the Angelos suits satisfy either test.  *See Cuyahoga*, 980 F.2d at 114.

16

1    bankruptcy court found in 2004, and Angelos does not contest, that the Insurance

2    Policies and Insurance Trust "may be utilized by Pfizer and Quigley to satisfy

3    settlements, judgments or defense costs related to Asbestos Related Claims against

4    either of them, on a first billed, first paid basis, irrespective of amounts previously

5    billed by or paid to Pfizer or Quigley."[7] OPI at 10.  The potential impact of the Angelos

6    suits on the bankruptcy estate is thus nothing but direct: at Pfizer's election, any

7    judgments, settlements, or litigation expenses arising out of the Angelos suits will be

8    paid by Quigley's estate.  This case is thus different from *Pacor, Inc. v. Higgins*, 743

9    F.2d 984 (3d Cir. 1984), *overruled on other grounds by Things Remembered, Inc. v.*

10   *Petrarca*, 516 U.S. 124 (1994), on which Angelos relies.  In *Pacor*, where the third party

11   had only a *potential* common law right of indemnification against the debtor, "any

12   judgment received by the plaintiff . . . could not itself [have] result[ed] in even a

13   contingent claim against [the debtor], since Pacor would still be obligated to bring an

14   entirely separate proceeding to receive indemnification." *Id.* at 995.[8]  Here, Pfizer need

15   not rely on a separate action for indemnification; rather, it has a now-existent legal

---

[7]This case thus differs from *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004).  There, the bankruptcy court made insufficient findings of fact as to whether two third parties and the debtor were insured under the same program (and also as to the program's terms and operations) for the Third Circuit to conclude that claims against the third parties would in fact have an adverse effect on the debtor's estate.  *See id.* at 232-33 & nn.42-43.

[8]*See also In re W.R. Grace & Co.*, 591 F.3d 164, 173 (3d Cir. 2009) ("[I]n order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must 'affect the bankruptcy [] without the intervention of yet another lawsuit.'" (alteration in original) (quoting *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002))).

17

right to utilize the assets of the Insurance Policies and Insurance Trust to satisfy judgments or settlements or pay defense costs. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001-02 (4th Cir. 1986) (indicating that proceedings against third parties "who may be entitled to indemnification under [an insurance] policy [owned by the debtor] or who qualify as additional insureds under the policy" are covered by the automatic stay); *see also In re Brentano's*, 27 B.R. 90, 92 (Bankr. S.D.N.Y. 1983) (exercising jurisdiction where an indemnification agreement between the debtor and a third party arranged that any judgment against the third party would automatically result in liability for the debtor), *cited in Pacor*, 743 F.2d at 995.[9]

Angelos also objects that, under this Court's decision in *Manville III*, the bankruptcy court did not have jurisdiction to enjoin the Angelos suits because they allege violations of an independent legal duty owed by Pfizer to the plaintiffs, rather than claims that are "derivative" under Pennsylvania state law. Again, we disagree. Because Angelos's mistake as to the nature of the jurisdictional inquiry under 28 U.S.C. § 1334(a) and (b) stems from a misunderstanding of our case law's treatment of derivative liability in the context of bankruptcy jurisdiction, however, we discuss our previous cases addressing this subject in some detail.

---

[9]We are unconvinced by Angelos's argument that the Angelos suits would not impact Quigley's estate because Pfizer would have to make a claim against the Insurance Policies or the Insurance Trust before any effect on Quigley's estate would occur. The parties entitled to contractual indemnity in *A.H. Robins* and *In re Brentano's* could presumably also have declined to insist on their contractual rights.

1    Our first case to address the role of derivative liability in the context of

2  bankruptcy jurisdiction was *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, part

3  of the long saga of litigation arising from the bankruptcy of the Johns-Manville

4  Corporation ("Manville"), a major national asbestos concern.   In *MacArthur*, we

5  addressed the question whether the bankruptcy court had jurisdiction to enjoin claims

6  against Manville's insurers by an asbestos distributor (MacArthur) when the

7  distributor claimed to be coinsured with Manville under "vendor endorsements"

8  contained in the Manville policies.  *Id.* at 91-93.  We concluded that it did.  *Id.* at 93.

9  After determining that the insurance policies in question constituted property of the

10  estate, we turned to MacArthur's argument that "because its own rights are separate

11  from Manville's, its claims under the vendor endorsements are too remote from the

12  Chapter 22 proceeding to permit the Bankruptcy Court to exercise jurisdiction."  *Id.*

13  at 92.  We noted that "[t]he vendor endorsements cover only those liabilities resulting

14  from the vendor's status as a distributor of Manville's products," that "[t]he

15  endorsements are limited by the product liability limits of the underlying Manville

16  policies and are otherwise subject to all of the terms of the underlying policies," and

17  that "MacArthur's rights as an insured vendor are completely derivative of Manville's

18  rights as the primary insured."  *Id.* at 92.  We reasoned that "[s]uch derivative rights

19  are no different . . . from those of the asbestos victims who have already been barred

20  from asserting direct actions against the insurers," *id.* (citing *In re Davis*, 730 F.2d 176

19

(5th Cir. 1984) (per curiam)),[10] and consequently found the bankruptcy court's exercise of jurisdiction proper.

*MacArthur* does not hold that third-party suits that affect the *res* of the bankrupt estate but that are nonetheless not derivative, in some sense, of the debtor's rights and liabilities fall outside federal bankruptcy jurisdiction. (Indeed, language to this effect would have been dicta, as *MacArthur* found jurisdiction proper. *Id.* at 93.) The primary thrust of the opinion in *MacArthur* focuses on the fact that the suits in question would impact the *res* of the bankruptcy estate. *See id.* at 91-92. We viewed the similarity of MacArthur's claims to direct actions against an insurer (over which the Fifth Circuit in *Davis* had already approved bankruptcy jurisdiction) as relevant to whether MacArthur's claims affected the bankruptcy estate, not as an independent requirement for the exercise of jurisdiction. *See id.* at 92-93 ("[MacArthur] seek[s] to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct. [MacArthur's] claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets."). The fact that MacArthur's rights under the vendor endorsements were derivative of Manville's – as opposed to non-derivative rights under separate insurance policies – indicated in that case that any proceeds Manville's insurers might owe MacArthur would come from Manville's insurance policies.

---

[10] A "direct action" in the insurance context is a suit, statutorily authorized in some states, in which "[t]he injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company." *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 179 (2d Cir. 2010) (quoting *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 858 (N.Y. 2004)) (internal quotation mark omitted).

1    Our next case to consider the role of derivative liability in the context of

2    bankruptcy jurisdiction was *Manville III*.  In that case, plaintiffs sought to bring suits

3    against Travelers, Manville's primary insurer for a period of years.  *Manville III*, 517

4    F.3d at 57.  The plaintiffs in many of these suits did not claim against Manville's

5    insurance policies,[11] but rather sought to hold Travelers liable for what they saw as its

6    independent tortious conduct.  *See id.* at 57-58.  For instance, some of these plaintiffs

7    alleged that they "declined to file personal injury suits against Manville because

8    Travelers . . . suppressed information about asbestos hazards and intentionally

9    propagated an allegedly-fraudulent 'state of the art' defense to frustrate claimants'

10    rights."  *Id.* at 57.  Travelers argued that the suits were enjoined pursuant to two

11    orders issued by the bankruptcy court in 1986.[12]  *Id.* at 58.

12    We held that bankruptcy jurisdiction did not exist to enjoin the suits in question.

13    We began by distinguishing *MacArthur* and the Fifth Circuit's decision in *Davis*, noting

14    that the plaintiffs' "claims seek damages from Travelers that are *unrelated* to the

15    policy proceeds, quite unlike the claims in *MacArthur* and *Davis* where plaintiffs

16    sought indemnification or compensation for the tortious wrongs of Manville to be paid

---

[11]The suits were thus not traditional "direct actions."  *See Manville III*, 517 F.3d at 55 n.4.

[12]The Supreme Court reversed this Court's decision in *Manville III* on the ground that given "the finality of the Bankruptcy Court's [1986] orders following the conclusion of direct review," res judicata barred the plaintiffs' challenge, two decades later, to the bankruptcy court's jurisdiction to enter the orders in 1986.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S. Ct. 2195, 2198 (2009).  In *Manville IV*, we clarified that the Supreme Court "did not contradict the conclusion of [*Manville III*'s] jurisdictional inquiry," 600 F.3d at 152, and we reaffirmed the jurisdictional analysis, *id.* at 148.

out of the proceeds of Manville's insurance policies." *Id.* at 63. We also noted that, unlike the claims in *MacArthur*, the claims at issue were not premised on Manville's conduct. *Id.* We faulted the courts below for failing to examine whether the suits in question sought to impose liability on Travelers on the basis of its "independent legal duty in its dealing with [the] plaintiffs," *id.*, noting that such an examination would have revealed that, while some of the claims were "premised on a statute that provides a direct action against an insurer when the insured is insolvent," the "vast majority" were claims which sought "to recover directly from [the] debtor's insurer for the insurer's own independent wrongdoing," "ma[d]e no claim against an asset of the estate," and whose litigation "[did not] affect the estate." *Id.* at 64-65. Accordingly, we concluded that the bankruptcy court had no jurisdiction "to enjoin claims against Travelers that were predicated, as a matter of state law, on Travelers' own alleged misconduct and were unrelated to Manville's insurance policy proceeds and the *res* of the Manville estate." *Id.* at 68.

   *Manville III* did not work a change in our jurisprudence. After *Manville III*, as before it, "a bankruptcy court . . . has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Manville III*, 517 F.3d at 66; *accord Cuyahoga*, 980 F.2d at 114. As in *MacArthur*, the salience of *Manville III*'s inquiry as to whether Travelers' liability was derivative of the debtor's rights and liabilities was that, in the facts and circumstances of *Manville III*, cases alleging derivative liability would affect the *res* of the bankruptcy estate, whereas cases alleging non-derivative liability would not. *Compare Manville III*, 517 F.3d at 64 ("[T]he claims

involving Louisiana law are premised on a statute that provides a direct action against an insurer when the insured is insolvent.  The recovery is against the policy . . . ."), *with id.* at 65 ("Here . . . Plaintiffs seek to recover directly from a debtor's insurer for the insurer's own independent wrongdoing. . . .  They raise no claim against Manville's insurance coverage.").  The *Manville III* panel thus quite properly used the derivative/non-derivative inquiry as a means to assess whether the suits at issue would affect the bankruptcy estate.  It did not impose a requirement that an action must both directly affect the estate *and* be derivative of the debtor's rights and liabilities for bankruptcy jurisdiction over the action to exist.

Our more recent decision in *Manville IV* made more explicit the fact that in *Manville III* derivative liability was discussed not as an independent jurisdictional requirement but as a factor demonstrating, in the circumstances of that litigation, that the suits in question would have an effect on the bankruptcy *res*.  We described our holding in *Manville III* as indicating "that the bankruptcy court's *in rem* jurisdiction was insufficient to allow it to enjoin . . .[a]ctions based on state-law theories that [sought] to impose liability on Travelers as a separate entity rather than on the policies that it issued to Manville." *Manville IV*, 600 F.3d at 152.  That is to say, *Manville III* drew a distinction between suits alleging non-derivative liability on the one hand, and suits affecting the *res* on the other.  By identifying the suits in question as non-derivative, the *Manville III* panel determined that they would not affect the bankruptcy estate.

23

1        It thus appears from our case law that, while we have treated whether a suit

2    seeks to impose derivative liability as a helpful way to assess whether it has the

3    potential to affect the bankruptcy *res*, the touchstone for bankruptcy jurisdiction

4    remains "whether its outcome might have any 'conceivable effect' on the bankruptcy

5    estate." *Cuyahoga*, 980 F.2d at 114.  This test has been almost universally adopted by

6    our sister circuits, *see Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (collecting

7    cases),[13] which in some instances have found bankruptcy jurisdiction to exist over non-

8    derivative claims against third parties.[14]    *See In re Stonebridge Techs., Inc.*, 430 F.3d

9    260, 263-64, 267 (5th Cir. 2005) (per curiam) (finding bankruptcy jurisdiction over a

10    negligent misrepresentation suit against a third party where the alleged

11    misrepresentation was undertaken by defendant, not debtor); *In re Dogpatch U.S.A.,*

12    *Inc.*, 810 F.2d 782, 786 (8th Cir. 1987) (finding bankruptcy jurisdiction over

13    counterclaim for breach of contract where liability sought to be imposed arose from

14    contracting party's alleged breach, not debtor's).  We see no reason to question these

15    decisions.  One of the central purposes – perhaps *the* central purpose – of extending

16    bankruptcy jurisdiction to actions against certain third parties, as well as suits against

17    debtors themselves, is to "protect[] the assets of the estate" so as to ensure a fair

---

[13]The Supreme Court, while noting the widespread approval of the "conceivable effect" test among the circuits, has not reached the question of whether to adopt this formulation as its own.  *See Celotex*, 514 U.S. at 308 n.6.

[14]By contrast, we are aware of no sister circuit cases finding a *lack* of bankruptcy subject matter jurisdiction where the third-party action in question could affect the bankrupt estate but was not derivative of the rights and obligations of the debtor.

1    distribution of those assets at a later point in time. *In re Zarnel*, 619 F.3d 156, 171 (2d

2    Cir. 2010). But whether the direct result of a suit against a third party will be the

3    removal of assets from the bankruptcy estate is separate from the question whether

4    the third party's alleged liability is derivative of the debtor's (although in certain suits,

5    as our case law indicates, the two questions may become intertwined). A suit against

6    a third party alleging liability not derivative of the debtor's conduct but that

7    nevertheless poses the specter of direct impact on the *res* of the bankrupt estate may

8    just as surely impair the bankruptcy court's ability to make a fair distribution of the

9    bankrupt's assets as a third-party suit alleging derivative liability.[14] Accordingly, we

10   conclude that, where litigation of the Angelos suits against Pfizer would almost

11   certainly result in the drawing down of insurance policies that are part of the

12   bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these

13   suits was appropriate.

14   *The Scope of the API*

15          Having concluded both that we have jurisdiction to hear this appeal and that the

16   bankruptcy court had jurisdiction to enjoin the Angelos suits, we next address whether

17   the Angelos suits fall within the scope of the API and were, for that reason, actually

18   enjoined.     As both parties acknowledge, we typically accord a bankruptcy court's

19   interpretation of its own order "customary appellate deference." *In re Casse*, 198 F.3d

---

[14]In neither circumstance, of course, is it necessarily the case that an injunction staying litigation during the course of bankruptcy proceedings is appropriate. A bankruptcy court's *jurisdiction* to enjoin an action does not *require* it to exercise that jurisdiction to enjoin a suit in a particular instance.

327, 333 (2d Cir. 1999).  Angelos urges, however, and the district court agreed, that

such deference does not apply here since the language of the API tracks the statutory

language of 11 U.S.C. § 524(g)(4)(A)(ii).  We recognize that, in the agency context, the

Supreme Court has held that judicial deference to an agency's interpretation of its own

regulations is inappropriate when those regulations "do[] little more than restate the

terms of [a] statute," because "the existence of a parroting regulation does not change

the fact that the question here is not the meaning of the regulation but the meaning

of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).  However, we need not

decide whether to apply this principle here, as the bankruptcy court clearly stated in

its CO that "[t]he Amended Injunction provides the same protection as a channeling

injunction under § 524(g)."  CO at *3.  Thus, the bankruptcy court itself believed that

it was interpreting the statute when it interpreted the API, and the meaning of the

statute is dispositive as to the meaning of the API.  We review the bankruptcy court's

statutory interpretation, like all legal conclusions, *de novo*.  *See In re Casse*, 198 F.3d

at 332.[15]

    As already noted, § 524(g) was enacted to address the unique problem posed by

asbestos-related bankruptcies.  Because symptoms of asbestos-related illness may not

manifest until decades after exposure, potential claimants against an asbestos

---

[15]We recognize that the API was not entered under the bankruptcy court's authority conferred in 11 U.S.C. § 524(g), but rather pursuant to 11 U.S.C. §§ 105(a) and 362(a).  API at 2.  However, Angelos does not contest the bankruptcy court's authority under these provisions to issue the API.  Accordingly, we examine only whether the API's terms encompass the Angelos suits.

1    manufacturer's bankruptcy estate may not know of their claims until years after the

2    estate has been depleted by other claimants whose symptoms became apparent earlier.

3    Section 524(g) addresses this difficulty by authorizing a bankruptcy court to enter,

4    along with confirmation of a reorganization plan, an injunction "channeling" certain

5    classes of claims to a trust set up in accordance with the reorganization plan, which

6    trust will then make payments to both present and future claimants. *See* 11 U.S.C. §

7    524(g)(1)-(2).[16]

8        To give bankruptcy courts power to channel all appropriate claims to the trust

9    – and to provide an incentive for parent or affiliated companies of an entity undergoing

10    asbestos-related bankruptcy to contribute to the trust – § 524(g) contains a provision

11    allowing the bankruptcy court to enter an injunction barring certain actions brought

12    against non-debtor third parties.  Section § 524(g)(4)(A)(ii) provides as follows:

13    [A]n injunction [under 11 U.S.C. § 524(g)] may bar any action directed
14    against a third party who is identifiable from the terms of such injunction
15    (by name or as part of an identifiable group) and is alleged to be directly
16    or indirectly liable for the conduct of, claims against, or demands on the
17    debtor to the extent such alleged liability of such third party arises by
18    reason of–
19
20        (I) the third party's ownership of a financial interest in the debtor,
21    a past or present affiliate of the debtor, or a predecessor in interest
22    of the debtor;
23
24        (II) the third party's involvement in the management of the debtor
25    or a predecessor in interest of the debtor, or service as an officer,
26    director or employee of the debtor or a related party;
27
28        (III) the third party's provision of insurance to the debtor or a
29    related party; or

---

[16]The requirements for a § 524(g) plan and trust are extensive but are relevant
here only as described below.

> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to–
>
> > (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
> >
> > (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

An injunction under the statute may thus properly bar an action against a third party only when that party is alleged to be liable "for the conduct of, claims against, or demands on" the debtor and to the extent that such liability arises "by reason of" one of the four relationships between the third party and the debtor enumerated in subsections (I) through (IV).[17]

The parties' principal disagreement focuses on the meaning of the phrase "by reason of." Stated simply, Pfizer argues that liability arises "by reason of" any of the four enumerated relationships when that relationship is a "but for," factual cause of the liability in question. Here, because Quigley, as a factual matter, would not have applied the Pfizer name and logo to its asbestos-containing products absent Pfizer's ownership interest in Quigley, Pfizer contends that its liability arises "by reason of" that ownership interest and that the Angelos suits were properly enjoined. Angelos, on the other hand, argues that, to fit within the parameters of 11 U.S.C. § 524(g), the liability sought to be imposed must arise as a *legal* consequence of one of the four enumerated relationships (or, stated differently, that the relationship, in light of the

---

[17]Given our conclusion that the Angelos suits do not "arise by reason of" the enumerated grounds, we need not address whether the suits seek to hold Pfizer directly or indirectly liable for the conduct of Quigley.

28

debtor's conduct or the claims asserted against it, must be a legal cause of or a legally relevant factor to the third party's alleged liability).  The API is inapplicable to the Angelos suits, according to Angelos, because Pfizer's liability as an "apparent manufacturer" under § 400 hinges on the presence of Pfizer's name and logo on Quigley's products, while the fact of Pfizer's ownership of Quigley is legally irrelevant.

We agree with Angelos.  Section 524(g) does not explicitly indicate whether the phrase "by reason of" refers to legal or factual causation, or some combination of the two.  We conclude, however, that several factors favor the interpretation proffered by the appellee.

In the first place, the statute lists four relationships between a third party and a debtor that, when resulting in alleged liability on the third party's part for the conduct of or claims against the debtor, may render an injunction appropriate.  As a matter of background legal principle, we deem it significant that each of these four relationships is of a sort that could, *legally*, have given rise to *actual* liability in appropriate circumstances prior to § 524(g)'s enactment.   For instance, 11 U.S.C. § 524(g)(4)(A)(ii)(I) provides a bankruptcy court with the power to enjoin an action that arises "by reason of" the third party's "ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor."  This subsection thus authorizes a bankruptcy court to bar actions seeking to impose liability on a third party in circumstances in which a plaintiff might have alleged that the third party was responsible for claims against the debtor on a "piercing the corporate veil"

theory.[18]  *See, e.g.*, *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir. 1997) (noting that, under New York law, a plaintiff seeking to pierce the corporate veil "must prove [among other things] that . . . the owner has exercised such control that the corporation has become a mere instrumentality of the owner") (brackets omitted). Similarly, § 524(g)(4)(A)(ii)(III) permits a bankruptcy court to enjoin a suit alleging liability "by reason of . . . the third party's provision of insurance to the debtor or a related party," thus referring to statutory "direct action" liability, as discussed above. Section 524(g)(4)(A)(ii)(IV) provides that litigation may be enjoined where plaintiffs contend that a third party is liable for claims against the debtor "by reason of" the third party's "involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party."  Here, too, such liability could arise, *inter alia* and given particular facts, on an aiding and abetting theory, as when one party induces another to commit a tort, *see, e.g.*, Restatement (Second) of Torts § 876(b) (1979), or on a successor liability theory, when a transaction results in the merger or consolidation of the two firms but "the purchaser is a mere continuation of the seller," or where "the transaction was entered into fraudulently for the purpose of escaping liability," *Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.*, 635 F.3d 48, 52 (2d Cir. 2011) (per curiam) (internal quotation marks omitted).

---

[18]A third party's "involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party," as provided in § 524(g)(4)(A)(ii)(II), could also give rise to liability on this basis.

1      Each of the four relationships enumerated in subsections (I) through (IV), then,

2   is a relationship between one party and another that, in appropriate circumstances,

3   has commonly given rise to the liability of the one party for the conduct of or claims or

4   demands against the other, long before § 524(g) came into being.  This circumstance

5   does not conclusively establish that § 524(g)(4)(A)(ii)'s channeling authority is limited

6   to situations in which the third party's relationship with the debtor is legally relevant

7   to its purported liability, so that a bankruptcy court is not authorized to bar litigation

8   when the relationship is merely a "but for" cause of the alleged liability.   The

9   background legal context against which § 524(g)(4)(A)(ii) was enacted, however,

10  suggests strongly that it was this sort of liability that Congress had in mind in

11  enacting the provision.  Were Pfizer's view of the matter correct, we would find it

12  surprising that each enumerated relationship in § 524(g)(4)(A)(ii) just happens to

13  correspond to a previously-recognized relationship that may, in appropriate

14  circumstances, give rise to the legal liability of one party for the conduct of or claims

15  against another.

16      Even brief consideration of another part of § 524(g) in which the "by reason of"

17  language is employed renders definite our conclusion in favor of Angelos's construction.

18  *See United States v. Cunningham*, 292 F.3d 115, 118 (2d Cir. 2002) ("[S]imilar

19  language contained within the same section of a statute must be accorded a consistent

20  meaning.").  Section 524(g)(3)(A)(ii) provides as follows:

21          No entity that pursuant to [a] plan [under § 524(g)] or thereafter becomes
22          a direct or indirect transferee of, or successor to any assets of, a debtor or
23          trust that is the subject of the injunction shall be liable with respect to

31

1      any claim or demand made against such entity by reason of its becoming
2      such a transferee or successor.

Consider this provision's application to a case in which a company first succeeds to significant assets of a bankrupt asbestos concern pursuant to, and after confirmation of, a § 524(g) reorganization plan and thereafter hires new employees to administer these assets, engaging in age discrimination in the hiring process. On Pfizer's reading of the phrase "by reason of," such a company could plead 11 U.S.C. § 524(g) as a barrier to liability, since its discrimination would not have occurred, as a factual matter, but for the company's succession to the assets of the bankrupt estate. Angelos's construction of "by reason of," in contrast, would not foreclose liability on a discrimination suit, because even if the discrimination would not have taken place but for the company's acquisition of the bankrupt's assets, any subsequent age discrimination claim would not be levied "by reason of" the company's acquisition of these assets, but "by reason of" the alleged discrimination itself.

We are confident that the Angelos reading of the statutory language at issue here is the correct one. Section 524(g) is designed to "facilitat[e] the reorganization and rehabilitation of the debtor as an economically viable entity," as well as "make[] it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004). Needless to say, barring the prosecution of claims bearing only an accidental nexus to an asbestos bankruptcy is less than tangentially related to that objective. Indeed (although the question is not before us), we strongly suspect that the bankruptcy courts

1    would not even have jurisdiction to enjoin the discrimination suit hypothesized above,

2    since it would not have any effect whatsoever on the *res* of the bankruptcy estate.  *See*

3    *Cuyahoga*, 980 F.2d at 114 ("The test for determining whether litigation has a

4    significant connection with a pending bankruptcy [sufficient to confer bankruptcy

5    jurisdiction] is whether its outcome might have any conceivable effect on the bankrupt

6    estate." (internal quotation marks omitted)).  We are unpersuaded that Congress

7    intended with its use of the phrase "by reason of" to produce the peculiar results and

8    jurisdictional difficulties that Pfizer's construction of this phrase would bring about.

9    We conclude that the phrase "by reason of," as employed in 11 U.S.C.

10    § 524(g)(4)(A)(ii), requires that the alleged liability of a third party for the conduct of

11    or claims against the debtor arises, in the circumstances, as a legal consequence of one

12    of the four relationships between the debtor and the third party enumerated in

13    subsections (I) through (IV).  Pfizer does not argue that its ownership of Quigley is

14    pertinent in any legal sense to the claims asserted in the Angelos suits.  Indeed, as the

15    District Court very aptly noted, Pfizer's ownership interest in Quigley is "legally

16    irrelevant" to the Angelos suits' § 400 claims.  District Court Opinion at 204.

17    Consequently, the API, modeled as it is on 11 U.S.C. § 524(g)(4)(A)(ii), does not enjoin

18    the suits at issue.

19    Finally, although not necessary to its holding, *Manville III* briefly addressed 11

20    U.S.C. § 524(g)(4)(A)(ii)'s requirement that any injunctions imposed under § 524(g) may

21    only bar actions against third parties "alleged to be directly or indirectly liable for the

22    conduct of, claims against, or demands on the debtor," suggesting that an injunction

33

1    is available only in "situations where . . . a third party has derivative liability for the

2    claims against the debtor." 517 F.3d at 67-68 (quoting *Combustion Eng'g*, 391 F.3d at

3    234) (internal quotation marks omitted). Angelos argues that the suits at issue may

4    not be enjoined pursuant to the API because § 400 liability is not derivative in nature

5    as a matter of Pennsylvania law. As explained *supra* note 17, because we conclude

6    that the Angelos suits do not attempt to fix on Pfizer liability "arising by reason of"

7    Pfizer's "ownership of a financial interest in" Quigley, 11 U.S.C. § 524(g)(4)(A)(ii)(I), we

8    do not reach this question.

9                                    **CONCLUSION**

10    For the foregoing reasons, the judgment of the District Court is AFFIRMED.

34